*Decision will be entered under Rule 50.*

AMERICAN BANTAM CAR COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 11531. Promulgated September 27, 1948.

*L. W. Eckels, Esq.,* and *C. W. Barstow, C. P. A.,* for the petitioner.
*Stanley W. Herzfeld, Esq.,* for the respondent.

OPINION.

HILL, *Judge*: This case requires the determination of the proper basis for the Austin assets acquired by petitioner on June 3, 1936, in exchange for stock. We must decide whether under the facts here section 113 (a) (8) (A) of the Internal Revenue Code requires petitioner, in computing deductions for depreciation, to take as the basis of the assets so acquired the basis thereof in the hands of the transferors. This section is applicable if the exchange by which petitioner received the Austin assets was one in which gain or loss is not recognized under the provisions of section 112 (b) (5) of the Revenue Act of 1936,[2] the year of the exchange. We therefore must first consider whether, when the associates turned over the Austin assets to petitioner, subject to liabilities of $219,099.83, plus $500 in cash, and in return petitioner issued to the associates 300,000 shares of its no par common stock, all the requirements of section 112 (b) (5) were satisfied.

At the outset it should be noted that the statute requires for a non-taxable exchange that the property turned over by the transferors be "solely" in exchange for stock or securities of the transferee corporation. The transferors in the instant case actually received from peti-

[2] SEC. 112. RECOGNITION OF GAIN OR LOSS.
* * * * * * *
(b) EXCHANGES SOLELY IN KIND.—
* * * * * * *
(5) TRANSFER TO CORPORATION CONTROLLED BY TRANSFEROR.—No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such person or persons are in control of the corporation ; * * *

tioner upon the exchange only 300,000 shares of common stock. Thus, the statutory requirement is met unless it can be said the transferors indirectly received "other property or money" by virtue of the fact the petitioner acquired the transferred property subject to liabilities. Section 213 (f) of the Revenue Act of 1939 [3] specifically states that such an acquisition of property subject to liability shall not be considered as "other property or money" received by the transferors. It is clear that a definite business purpose motivated this transaction. Therefore such acquisition by the petitioner does not prevent the exchange from being within the provisions of section 112 (b) (5) and the transferors in exchange for their property did receive "solely" stock from the corporation.

It has been held that money turned over to the transferee corporation by the transferors does not prevent a tax-free exchange, for it is includible within the term "property" in section 112 (b) (5). Regulations 111, sec. 29.112 (b)–5; C. B. 1944, p. 219; *Haliburton* v. *Commissioner*, 78 Fed. (2d) 265. Therefore, the $500 transfer of cash to petitioner by the associates comes within the terms of section 112 (b) (5).

The first major test of a tax-free exchange under section 112 (b) (5) is whether the transferors have "control" of the corporation immediately after the exchange. Section 112 (h) of the Revenue Act of 1936 defines "control":

As used in this section the term "control" means the ownership of stock possessing at least 80 per centum of the total combined voting power of all classes of stock entitled to vote and at least 80 per centum of the total number of shares of all other classes of stock of the corporation.

---

[3] SEC. 213. ASSUMPTION OF INDEBTEDNESS.

\* \* \* \* \* \* \*

(f) Assumption of Liability Not Recognized Under Prior Acts.—

(1) Where upon an exchange occurring in a taxable year ending after December 31, 1923, and beginning before January 1, 1939, the taxpayer received as part of the consideration property which would be permitted by subsection (b) (4) or (5) of section 112 of the Revenue Act of 1938, or the corresponding provisions of the Revenue Act of 1924 or subsequent revenue Acts, to be received without the recognition of gain if it were the sole consideration, and as part of the consideration another party to the exchange assumed a liability of the taxpayer or acquired from the taxpayer property subject to a liability, such assumption or acquisition shall not be considered as "other property or money" received by the taxpayer within the meaning of subsection (c), (d), or (e) of section 112 of the Revenue Act of 1938, or the corresponding provisions of the Revenue Act of 1924 or subsequent revenue Acts and shall not prevent the exchange from being within the provisions of subsection (b) (4) or (5) of section 112 of the Revenue Act of 1938, or the corresponding provisions of the Revenue Act of 1924 or subsequent revenue Acts; except that if, in the determination of the tax liability of such taxpayer for the taxable year in which the exchange occurred, by a decision of the Board of Tax Appeals or of a court which became final before the ninetieth day after the date of enactment of the Revenue Act of 1939, or by a closing agreement, gain was recognized to such taxpayer by reason of such assumption or acquisition of property, then for the purposes of section 112 of the Revenue Act of 1938, and corresponding provisions of the Revenue Act of 1924 or subsequent revenue Acts, such assumption or acquisition (in the amount of the liability considered in computing the gain) shall be considered as money received by the taxpayer upon the exchange.

(2) Paragraph (1) shall be effective with respect to the Revenue Act of 1924 and subsequent revenue Acts as of the date of enactment of each such Act.

The first question, then, is whether the associates had such "control" over the petitioner immediately after the exchange on June 3, 1936. Prima facie, when the various steps taken to organize the new corporation and transfer assets to it are considered separately, the associates did have "control" of the petitioner immediately after the exchange within the statutory definition of the word. We think that from June 3 to June 8, 1936, they owned 100 per cent of all the issued stock, and from June 8, 1936, until October 1937 they owned stock possessing at least 80 per cent of the total combined voting power of all classes of stock. On June 3, 1936, the associates were issued absolutely and unconditionally 300,000 shares of no par common stock. The resolution of the board of directors of petitioner accepting the associates' offer of the Austin assets attached no strings whatsoever to the issuance of the stock to them. It is true that on June 2, 1936, petitioner had an authorized capital stock of 700,000 shares, 600,000 common shares and 100,000 preferred shares, but in determining control only stock actually issued is considered. *Louangel Holding Corporation* v. *Anderson*, 9 Fed. Supp. 550. On June 8 no other common stock had been issued, and a contract regarding possible future assignment of those 300,000 shares already issued was not entered into before that date. No preferred stock had been issued on June 3, nor was a contract for its sale provided until June 8. The statutory words "immediately after the exchange" require control for no longer period; in fact, momentary control is sufficient. *Evans Products Co.*, 29 B. T. A. 992. Certainly, therefore, the associates had absolute control over the corporation from June 3 to June 8, 1936, due to their complete ownership of all outstanding stock.

It is true that, by virtue of their agreement with the associates on June 8, 1936, the underwriters did at that time acquire the right to earn shares of the common stock issued to the associates by the sale of certain percentages of preferred stock, but the ownership of the 300,000 shares remained in the associates until such sales were completed. It is significant to note that this agreement stated that the associates were the owners of the 300,000 shares. On August 16, 1936, the associates deposited all their shares in escrow with the Butler County National Bank & Trust Co., but they only surrendered possession by the terms of their agreement with the bank and retained all other attributes of ownership.

During all of 1936 the associates retained ownership over the 300,000 shares of common stock and during that interval the underwriters sold only 14,757 shares of preferred stock, which did not entitle them to any common stock under the agreement of June 8, 1936. The corporation's bylaws provided that each share of preferred stock should have 3 votes, while each share of common stock should have 1 vote.

Therefore, at the end of 1936, out of 344,271 possible stock votes, the total combined voting power of all outstanding stock, the associates owned 300,000, or over 80 per cent. It was not until October 1937, when the underwriter Grant received 87,900 shares of the associates' common stock in fulfillment of the underwriting agreement, that the associates lost "control" of petitioner within the statutory definition of the word. Retention of "control" for such a duration of time satisfies the governing provision of section 112 (b) (5).

Petitioner, however, contends that the series of steps organizing the new corporation, transferring assets to it, and arranging for the sale of its preference stock must be considered as parts of the integrated plan formulated in May 1936, and, therefore, considered as parts of a single transaction. It argues that this unified transaction started on June 2, 1936, when petitioner was incorporated, and ended in October 1937, when the public offering of the preferred stock by the underwriters ceased and Grant was awarded 87,900 shares of common stock; that the transfer of common stock to Grant in 1937 was the final step of an indivisible operation and must be viewed concurrently with the preceding steps. On this theory the associates did not obtain control of petitioner, for on consummation of this final step in the general plan the associates had only 212,100 shares of common stock, while Grant had 86,892 shares and the public had 1,008 and there were 83,618 shares of outstanding preferred stock owned by the public. The 212,100 stock votes held by the associates in October 1937 fell shy of the required 80 per cent to give the requisite control.

In determining whether a series of steps are to be treated as a single indivisible transaction or should retain their separate entity, the courts use a variety of tests. Paul, Selected Studies in Federal Taxation, 2d series, pp. 200–254. Among the factors considered are the intent of the parties, the time element, and the pragmatic test of the ultimate result. An important test is that of mutual interdependence. Were the steps so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series?

Using these tests as a basis for their decisions the courts in *Hazeltine Corporation* v. *Commissioner*, 89 Fed. (2d) 513, and *Bassick* v. *Commissioner*, 85 Fed. (2d) 8, treated the series of steps involved in each case as parts of a unified transaction and therefore determined that the transferors of assets to the new corporation did not acquire the requisite control. An analysis of the fact situations involved shows salient distinguishing features from the present facts. In each of the above cases there was a written contract prior both to the organization of the new corporation and the exchange of assets for stock which bound the transferors unconditionally to assign part of the stock acquired

to third parties after the exchange. Thus, at the moment of the exchange the recipient of the stock did not own it, but held it subject to a binding contractual obligation to transfer a portion. The court in each case thought that the incorporation and exchange would never have been agreed upon without the supplemental agreement turning over stock to a third party. In such situations it is logical for the courts to say that the exchange and the subsequent transfer are part of one and the same transaction, so that the transferor never actually owned the shares he later assigned.

A close examination of the facts surrounding the exchange in the present case makes it clear that the exchange of assets for stock and the subsequent transfer of a portion of that stock to Grant therein involved should not be considered part of the same transaction so as to deprive the associates of "control" immediately after the exchange. The facts are distinguishable from those existing in the *Hazeltine* and *Bassick* cases on three grounds. First, there was no written contract prior to the exchange binding the associates to transfer stock to the underwriters. At the most, there was an informal oral understanding of a general plan contemplating the organization of a new corporation, the exchange of assets for stock, and marketing of preferred stock of the new corporation to the public. A written contract providing for the transfer of shares from the associates to the underwriters did not come until five days after the exchange. Secondly, when the transfer of shares to the underwriters was embodied specifically in a formal contract, the underwriters received no absolute right to ownership of the common stock, but only when, as, and if, certain percentages of preferred stock were sold. How clearly contingent was the nature of their rights is illustrated by the fact that only one underwriter, Grant, met the terms of the agreement and became entitled to any shares. Thirdly, the necessity of placing the 300,000 shares in escrow with a bank is indicative of complete ownership of such stock by the associates following the exchange.

The standard required by the courts to enable them to say that a series of steps are interdependent and thus should be viewed as a single transaction do not exist here. It is true that all the steps may have been contemplated under the same general plan of May 1936; yet the contemplated arrangement for the sale of preferred stock to the public was entirely secondary and supplemental to the principal goal of the plan—to organize the new corporation and exchange its stock for the Austin assets. The understanding with the underwriters for disposing of the preferred stock, however important, was not a *sine qua non* in the general plan, without which no other step would have been taken. While the incorporation and exchange of assets would have been purposeless one without the other, yet both would

have been carried out even though the contemplated method of marketing the preferred stock might fail. The very fact that in the contracts of June 8, 1936, the associates retained the right to cancel the marketing order and, consequently the underwriters' means to own common stock issued to the associates, refutes the proposition that the legal relations resulting from the steps of organizing the corporation and transferring assets to it would have been fruitless without the sale of the preferred stock in the manner contemplated.

Finally, to say that the separate steps should be viewed as one transaction so that ownership of 87,900 shares never passed to the associates has the disadvantage of inferring that the interested parties intended to suspend ownership of 300,000 shares from June 3, 1936, until such time as the underwriters definitely did or did not earn the right to such shares—as it turned out, until October 1937. It is much more logical to say that ownership of all 300,000 shares rested in the associates until the conditions precedent had been fulfilled by the underwriters, and that when the associates turned over the stock to Grant they were exercising their rights of ownership acquired on June 3, 1936. To allow petitioner's contention is to permit a 15-month time lag after the exchange before determining "control immediately after the exchange." Such a proposition defeats the very language of the statute.

A review of decisions encountering this problem under section 112 (b) (5) shows that courts have determined control of the new corporation remained with the transferors of assets following the exchange under circumstances less favorable than in the present case.

In *Federal Grain Corporation*, 18 B. T. A. 242, the Board held that the fact that recipients of stock had, prior to the exchange of assets for stock, made an anticipatory agreement granting an option to purchase this stock to a third party, did not shift ownership from the transferors of the assets. While the contractual arrangement of the underwriters of June 8, 1936, is similar to an option, yet they had only a contingent right, revocable by the grantors, and not an absolute right as in the *Federal Grain* case, *supra*, so that we have an even stronger ground for determining that control was acquired by the associates.

In *Samuel Insull, Jr.*, 32 B. T. A. 47, 54, 55, prior to the organization of the new corporation, the future transferors of assets for stock of the corporation made an informal agreement to transfer a part of such shares to a third party in consideration of incorporation services to be rendered; the proposed assignment was to be absolute and unconditional; and the contract for the exchange of assets for stock made between the transferor and the new corporation embodied this contemplated assignment to a third party by the transferors. The Board stated:

\* \* \* Upon the basis of this stipulation [concerning the informal agreement] the respondent contends that all of the steps contemplated in the exchange transaction were not completed until after Halsey, Stuart & Co. had acquired \* \* \* the 57,000 shares of common stock.

Although the transactions above referred to were contemplated by the petitioners prior to the organization of Insull Utility Investments, Inc., it can not be said that they in any wise affected the exchange transaction by which the petitioners transferred securities to Insull Utility Investments, Inc., and received the issued preferred stock, first series, and all the common stock in exchange therefor. The petitioners received their shares of stock on January 11, 1929. The exchange transaction was completed on that date. The petitioners, with Martin J. Insull, were the owners of all the issued capital stock of Insull Utility Investments, Inc.

\*      \*      \*      \*      \*      \*      \*

\* \* \* Clearly, "immediately after the exchange" the transferors were in control of Insull Utility Investments, Inc., and remained in control of it until after January 18, 1929. What happened on and after that date has no bearing upon the question in issue. \* \* \*

In *Schmieg, Hungate & Kotzian, Inc.*, 27 B. T. A. 337, 341, 342, an oral agreement was made between the partnership of Schmieg & Kotzian and one Hungate before the formation of the new corporation and the exchange of assets for stock whereby the partners were to receive two-thirds of the common stock in exchange for their assets and Hungate was given an absolute right to one-third of the stock. The corporation was organized and the partners were issued all the stock except for qualifying shares. Hungate did not want any shares issued in his name at the time of the exchange because of pending litigation. Five years later Hungate's shares of common stock were assigned to him by Schmieg and Kotzian. The Board found that the ex-partners were in control of the new corporation immediately after the exchange, despite the unconditional prior oral agreement. The Board stated:

\* \* \* we hold that, notwithstanding the verbal agreement which Hungate had with Schmieg and Kotzian in 1923 \* \* \* the actual transaction which was put through in January, 1924, was a sale of the assets of the partnership to the newly organized corporation in consideration for the issuance of all the stock to Schmieg and Kotzian. They became the owners of the stock and were in control of the corporation, within the meaning of section 112 (j) of the Revenue Act of 1928. \* \* \*

\* \* \* When, after the sale of assets by the partnership to the corporation, the partners, Schmieg and Kotzian, who had received all the stock, transferred some of it to Hungate, they were merely exercising a right of ownership. \* \* \*

Thus we conclude that in the present case the exchange of assets for stock between the associates and petitioner on June 3, 1936, was a separate completed transaction, distinct from the subsequent transfer of common stock to Grant, so that the associates were in control of petitioner immediately after the exchange within the provisions of section 112 (b) (5).

The second major prerequisite for a tax-free exchange under section 112 (b) (5) of the code,[4] is that the amount of stock or securities received by each of the transferors must be substantially in proportion to his interest in the property prior to the exchange. Where, as in the instant case, the transferee corporation received the transferred property subject to liabilities, then for the purpose of determining whether the amount of stock or securities received by each transferor is in the required proportion, the amount of such liability is considered as stock or securities received by such transferor. Sec. 112 (b) (5).[4] Therefore, the fact issue in the instant case becomes whether the shares of stock received by each associate from the corporation on June 3, 1936, including as stock the liabilities placed on the Austin assets, was substantially in proportion to his interest in the Austin assets and the $500 transferred to the corporation. We have already determined that the exchange transaction was completed on June 3, 1936, and we shall consider no stock transfers thereafter in deciding this issue.

Each of the three associates had a proportionate interest in all the property transferred to petitioner; that is, the Austin assets and the $500 cash. The evidence shows that at the time of the exchange Martin Tow had a 46.25 per cent interest, R. S. Evans had a 46.25 per cent interest, and W. A. Ward, Jr., had a 7.50 per cent interest in the Austin assets. It can be presumed they held interests in the $500 cash in exactly the same ratio. Since the liabilities of $219,099.83 transferred in the exchange were on the Austin assets, owned in common by Tow, Evans, and Ward, each associate bore the burden of such liabilities in exactly the same proportion as his interest in such property.

By virtue of the exchange on June 3, 1936, each transferor received a portion of the 300,000 shares of common stock in the same ratio as his interest in the total property transferred. Tow received 138,750 shares or 46.25 per cent of the stock, Evans received 138,750 shares or 46.25 per cent, and Ward received 22,500 shares or 7.50 per cent. For the purpose of this statutory requirement, the $219,099.83 of liabilities

---

[4] SEC. 112. RECOGNITION OF GAIN OR LOSS.

\* \* \* \* \* \* \*

(b) EXCHANGES SOLELY IN KIND.—

\* \* \* \* \* \* \*

(5) TRANSFER TO CORPORATION CONTROLLED BY TRANSFEROR.—\* \* \* but in the case of an exchange by two or more persons this paragraph shall apply only if the amount of the stock and securities received by each is substantially in proportion to his interest in the property prior to the exchange. Where the transferee assumes a liability of a transferor, or where the property of a transferor is transferred subject to a liability, then for the purpose only of determining whether the amount of stock or securities received by each of the transferors is in the proportion required by this paragraph, the amount of such liability (if under subsection (k) it is not to be considered as "other property or money") shall be considered as stock or securities received by such transferor.

[The last sentence of subsection (b) (5) was added by section 213 (c) of the Revenue Act of 1939 and was retroactively included in the Revenue Act of 1936 by section 213 (h) of the Revenue Act of 1939.]

to which the transferred property was subject is considered as stock received by the transferors, but such additional shares would also be distributed among the three associates in exactly the same ratio as their respective interests in the Austin assets, since this was the property encumbered by these liabilities. Therefore, the amount of stock acquired by each of the associates was substantially in proportion to his interest in the Austin assets and the $500 cash transferred to petitioner. Thus we conclude the transaction on June 3, 1936, was a tax-free exchange within the provisions of section 112 (b) (5) and resulted in no recognizable profit or loss.

What then is the basis for depreciation purposes of property acquired by a corporation by a tax-free exchange under section 112 (b) (5)? Section 113 (a) (8) of the code [5] specifically answers this question. The basis is the same as it would be in the hands of the transferor. In the instant case the basis of the Austin assets in the hands of the associates was the cost of those assets to them. They paid $5,000 cash and received the property subject to liabilities of $219,099.83. Thus the basis in their hands was $224,099.83. Therefore, the basis for the Austin assets to the petitioner is also $224,099.83, as contended by the respondent.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

LEECH, *J.*, concurring: In my judgment the various steps outlined in the majority opinion were integrated parts of a single plan rather than independent undertakings. The fact that the plan was not reduced to writing is unimportant, since it was carried out as orally agreed upon. The record, in my opinion, is insufficient to establish that the corporation agreed to pay or paid more for the assets it acquired than the price at which the transferors purchased them. Hence, the basis to the corporation would be the same as found by the majority. Therefore, I concur only in the result.

---

[5] SEC. 113. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS.

(a) BASIS (UNADJUSTED) OF PROPERTY.—The basis of property shall be the cost of such property; except that—

* * * * * * *

(8) PROPERTY ACQUIRED BY ISSUANCE OF STOCK OR AS PAID-IN SURPLUS.—If the property was acquired after December 31, 1920, by a corporation—

(A) by the issuance of its stock or securities in connection with a transaction described in section 112 (b) (5) (including, also, cases where part of the consideration for the transfer of such property to the corporation was property or money, in addition to such stock or securities), or

(B) as paid-in surplus or as a contribution to capital,

then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain or decreased in the amount of loss recognized to the transferor upon such transfer under the law applicable to the year in which the transfer was made.