THE MANHATTAN BUILDING COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 52460.   Filed March 29, 1957.

*Frank A. Harrington, Esq.*, and *Donald M. Hawkins, Esq.*, for the petitioner.

*Lyman G. Friedman, Esq.*, for the respondent.

OPINION.

TIETJENS, *Judge:* The respondent determined deficiencies for 1945 in income tax in the amount of $30,473.03 and in personal holding company surtax in the amount of $3,207.21. The deficiencies resulted from the determination that the petitioner realized a long-term capital gain of $67,396.03 on the sale of certain real estate (referred to herein as the Summit Street property) instead of a loss of $32,603.97

from the sale of property other than a capital asset and from the disallowance of deductions for certain real estate taxes in the amount of $1,642.25.

The petitioner alleges error in the determination that it realized a long-term capital gain from the sale of the Summit Street property. The disallowance of deductions claimed for certain real estate taxes is not contested. The petitioner also seeks a refund of taxes allegedly overpaid in the amount of $1,430.46 in income tax and $28,806.27 in personal holding company surtax based upon allegations that its loss on the sale of the Summit Street property was not $32,603.97 but was $68,014.37; that it is entitled to a deduction for depreciation on the Summit Street property in the amount of $271.43 for the year 1945, instead of $33.88 as originally allowed; and that it is entitled to a deduction for depreciation on certain other real estate (referred to herein as the Jefferson Street property) in the amount of $2,585 for the year 1945, instead of $1,270.51 as originally allowed.

The sole issue for determination is the petitioner's basis in the Summit Street property and the Jefferson Street property. A stipulation of facts with exhibits was filed. Testimony was introduced concerning the valuation of certain property in 1922. In our view of the case we deem it unnecessary to determine this value. Accordingly, the conclusions reached are based upon the stipulated facts.

The petitioner filed its income and personal holding company tax returns for the calendar year 1945 with the collector of internal revenue at Toledo, Ohio.

The facts are found as stipulated and the exhibits to the stipulation are incorporated herein by this reference. These facts are stated here to the extent considered necessary.

The petitioner is an Ohio corporation having its principal place of business at Toledo, Ohio. Prior to December 1941, the name of the petitioner was The Bell Realty Company. In December 1941, the petitioner, The Bennett Realty Company, The Ajax Investment Company, and the Manhattan Building Company (organized in 1924) adopted a tax-free plan of reorganization in which all the assets of the other corporations were transferred to the petitioner in exchange for its stock. Following the reorganization the Manhattan Building Company (1924) was dissolved and the petitioner amended its articles to change its name to The Manhattan Building Company. The petitioner and its predecessor, Manhattan, kept books and made tax returns on an accrual basis of accounting.

In November 1921, the Willys Corporation, a manufacturer of automobiles, was placed in receivership in certain Federal courts. Among the assets of Willys were factories at Toledo and Fostoria, Ohio, and Poughkeepsie, New York, operated by a division known as the Auto-

Lite Division. This division manufactured generators and ignition systems for Willys and other automotive manufacturers. The manager of the Auto-Lite Division prior to the receivership was Clement O. Miniger, who was appointed as one of the three receivers of Willys.

Dillon, Read & Company, and Hemphill, Noyes & Company, hereinafter referred to as the underwriters, entered into an agreement with Miniger concerning the acquisition of the assets of the Auto-Lite Division and their transfer to a new corporation as a going concern under the management of Miniger. This agreement was embodied in a letter from the underwriters to Miniger under date of April 26, 1922, which stated, in part:

We understand that the receivers of the Willys Corporation are about to make an application to the court for permission to sell the Electric Auto-Lite Division, which forms a part of the assets of the Willys Corporation now in the possession of the receivers.

We wish to confirm our mutual understanding to the effect that you will endeavor to purchase all of the property and assets of every sort belonging to the Electric Auto-Lite Division of the Willys Corporation, as of February 28, 1922, for $5,000,000. or less, and that if the court approves the sale of such property to you on such terms, in consideration of the appraisals and examinations that we are making of the said properties, you will offer to us, on the terms and conditions hereinafter outlined, which you agree to carry out, $3,500,000. First Mortgage 7½% 10 Year Gold Bonds of the new corporation to be formed to take over said assets, together with certain shares of stock of such corporation, or voting trust certificates representing the same; such bonds to be dated on or about June 1, 1922. We agree that we will give you not later than ten days before the date set by the court for the sale of the property (hereinafter called the "sales' date"), a definite answer as to whether or not we will purchase the bonds and voting trust certificates for stock from you on the terms stated. In case we so notify you that we will purchase the bonds and voting trust certificates for stock, the transaction will be carried out between us according to the terms and provisions of this letter; otherwise neither you nor ourselves will be bound by the provisions of this letter.

Should we notify you as above provided that we will purchase the bonds and voting trust certificates for stock, and thereafter the sale of the property is adjourned for more than ten days by the court, we will not be bound in any respect by such notice to purchase the bonds and voting trust certificates for stock, and for all the purposes of this letter and the obligations and privileges of you and ourselves thereunder, the date of the adjourned sale shall be considered as the original sales' date, and in the same manner, in the event of any further adjournment or adjournments by the court for more than ten days of the date of sale, such adjourned date of sale shall be considered as the original "sales date".

All of the property and assets of every sort belonging to the Electric Auto-Lite Division of the Willys Corporation at the time of your purchase, shall be turned over by you to a corporation organized to receive the same, which corporation shall issue to you, in payment therefor, the said $3,500,000. of mortgage bonds and 250,000 shares of stock without nominal or par value of the new corporation. * * *

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

At the time of the delivery of the mortgage bonds to us, you will cause to be deposited not less than 100% of the total authorized capital stock of the new corporation, less directors qualifying shares if necessary, under a voting trust. The voting trustees thereunder shall consist of three members, one of whom shall be yourself or the nominee of yourself, or in case of your death, of your executors; one the nominee of Dillon, Read & Co.; and one the nominee of Hemphill, Noyes & Co. * * *

    *      *      *      *      *      *      *

Should the court fail to confirm the sale of the property to you within fifteen days after the date of sale, we shall have the right at any time thereafter to terminate any obligation that we may then have to purchase said mortgage bonds and voting trust certificates for stock, upon written notice sent to you at Toledo, Ohio, by mail. At any time within thirty days after confirmation of the sale, if we have not terminated our obligation to purchase the securities as above provided, upon written notice sent to you at Toledo, Ohio, by mail, you will deliver to us the said $3,500,000. of bonds and voting trust certificates for stock, provided that the same are then duly executed, issued and ready for delivery. We shall not be required, however, to take delivery of and pay for said bonds and voting trust certificates for stock unless the same are duly executed, issued and delivered to us before the expiration of said period of thirty days after the confirmation of the sale, provided that we shall have the right at our option, from time to time, upon written notice sent to you at Toledo, Ohio, by mail, to extend the period within which you shall be required to deliver said bonds and voting trust certificates for stock and we shall be required to purchase the same as aforesaid.

It is also understood, of course, that we shall not be required to buy the said mortgage bonds unless the organization of the new corporation, its title to the properties to be acquired by it, the legality of the said mortgage bonds and the mortgage securing the same, and the issue of the stock of the new corporation and the voting trust are, in all legal respects, approved by our counsel. You and the corporation to be formed to take over the assets of the Electric Auto-Lite Division and to issue the bonds, are to complete all details of the organization of the corporation, issue of bonds, etc., to the satisfaction of our counsel. * * *

We are to receive with the said $3,500,000. of mortgage bonds, voting trust certificates for 75,000 shares of stock of the new corporation out of the said 250,000 shares, and are to pay for the said bonds and voting trust certificates, the sum of $3,220,000., together with accrued interest on the bonds. It is agreed that you will deliver to the corporation, without receiving any payment therefor, voting trust certificates representing 49,000 shares of stock of the corporation, and will use your best efforts to sell, for the benefit of the corporation, at a price satisfactory to Dillon, Read & Co. and Hemphill, Noyes & Co., the said voting trust certificates representing 49,000 shares of the capital stock of the corporation.

## On April 28, 1922, the underwriters wrote Miniger:

Referring to our letter to you of April 26th respecting the contemplated purchase by you of all of the property and assets of the Electric Auto-Lite Division of the Willys Corporation at the Receivers Sale for the sum of $5,000,000. or less, it is understood between you and ourselves in consideration of your accepting the terms of that letter, and this letter is in confirmation of this understanding, as follows:

You will not be required to bid at the sale for the Poughkeepsie plant of Willys Corporation and if that plant is not purchased by you the said plant shall be deducted from the property of Electric Auto-Lite Division of Willys Corporation

mentioned in our said letter and the price to be bid by you for the remainder of said property shall be reduced to the sum of $4,700,000 or less, and the amount of the bond issue to be placed upon the property of the corporation which is to take over Electric Auto-Lite Division of Willys Corporation shall be reduced to the sum of $3,200,000. and for all the purposes of your agreement with us as evidenced by our said letter to you and your acceptance thereof, the expression "all the property and assets of every sort of the Electric Auto-Lite Division of Willys Corp." shall be considered as meaning all of said property other than the Poughkeepsie plant.

On May 18, 1922, the underwriters wrote Miniger:

We take pleasure in advising you that subject to the conditions outlined in the letters to you of April 26th and 28th, 1922, signed by ourselves and accepted by you, if you are the purchaser at the sale by the court, to be held May 29th, 1922 or on any adjourned date, provided that such adjournment is not for more than ten days from said date, of the property and assets described in the above referred to letters, we will purchase from you the bonds and voting trust certificates for stock referred to therein on the terms stated, subject to our right to terminate such obligation should the court fail to confirm the sale to you within 15 days after the date of sale.

The offer and acceptance described above was modified on June 22, 1922, by an agreement which reduced the principal amount of the bond issue from $3,500,000 to $3,000,000. .

On May 1, 1922, the United States District Court for the Northern District of Ohio ordered that the assets of the Auto-Lite Division subject to its jurisdiction be sold.

On May 27, 1922, Miniger resigned as a receiver of Willys. On May 29, 1922, the assets of the Auto-Lite Division subject to the jurisdiction of the United States District Court for the Northern District of Ohio were offered for sale and no bidder appeared. On June 7, 1922, such assets were reoffered for sale. The only bid was $4,700,000 less a credit of $30,000 plus the assumption of certain liabilities of the Auto-Lite Division, which bid was made by Miniger. On June 19, 1922, the District Court for the Northern District of Ohio confirmed the sale of the assets of the Auto-Lite Division to Miniger on the basis of his bid.

On May 6, 1922, the United States District Court for the Southern District of New York ordered that the assets of the Auto-Lite Division subject to its jurisdiction (the Poughkeepsie plant) be sold. On May 31, 1922, these assets were offered for sale and no bidder appeared. On June 14, 1922, such assets were reoffered for sale. The only bid was $300,000 made by Miniger. This sale was confirmed on July 6, 1922.

On May 31, 1922, The Electric Auto-Lite Company, hereinafter referred to as Auto-Lite, was incorporated in the State of Ohio with $500 stated capital and 500 shares of authorized common stock without par value. On June 23, 1922, that company's authorized common stock was increased to 250,000 shares without par value.

On June 24, 1922, Miniger offered to sell to Auto-Lite the assets of the Auto-Lite Division acquired by him at the above-mentioned sales and Auto-Lite accepted.

On July 12, 1922, Miniger entered into an employment contract with Auto-Lite, to serve from June 1, 1922, to July 1, 1932, as manager for compensation of $5,000 per month plus a commission of 10 per cent of net earnings in excess of $1,000,000 each year.

On July 17, 1922, the receivers of Willys delivered the assets of the Auto-Lite Division to Miniger and received payment of $4,670,000 for the assets in Ohio and $300,000 for those in New York. At the same time, Miniger delivered the assets received, except for $2,241,-528.25 cash, which was paid to the receivers, to Auto-Lite and in return received from Auto-Lite 250,000 shares of its common stock and $3,000,000 face value of its bonds. Miniger transferred the stock to the trustees of a voting trust created in accordance with the agreement of April 26, 1922, and received in return 3 voting trust certificates for 75,000 shares, 49,000 shares, and 126,000 shares, respectively. Miniger then transferred the voting trust certificate for 75,000 shares and the $3,000,000 in face amount of bonds of Auto-Lite to the underwriters in return for $2,764,998.67 which Miniger paid to Auto-Lite, which in turn paid $2,728,471.75 to the receivers of Willys on behalf of Miniger, and retained the rest.

On July 25, 1922, Miniger returned to Auto-Lite a voting trust certificate for 47,500 shares of its own common stock. This did not conform to the terms of the offer, but the transaction as actually carried out represented the understanding between the parties. Miniger retained 127,500 shares for himself.

Neither gain nor loss was reported by Miniger in his Federal income tax return for the calendar year 1922 from the exchange of assets for Auto-Lite stock and bonds. The facts regarding the exchange were disclosed to the respondent on audit of Miniger's Federal income tax returns for the calendar years 1922 and 1923.

In December 1922, Miniger transferred 100,000 shares of Auto-Lite stock, and some other stocks, to The Ajax Investment Company, in exchange for 4,500 shares of Ajax stock.

In November 1924, Ajax entered into an agreement to purchase from Walter W. Hoskin certain real estate at 406 Summit Street, Toledo, herein referred to as the Summit Street property, in exchange for 2,500 shares of Auto-Lite stock. In the contract Ajax agreed to repurchase this stock or any unsold part of it for $55 per share on 30 days' notice at any time between January 1, 1925, and January 1, 1928, and Hoskin agreed to give Ajax the right to repurchase at $65 per share on 5 days' notice within that same time.

In December 1924, Ajax offered to assign the Hoskin agreement to Manhattan Building Company (organized 1924), herein referred to as Manhattan, one of the predecessors of the petitioner.

In December 1924, Miniger and his wife and daughter transferred 2,500 shares of Auto-Lite stock to Manhattan in exchange for an equal number of shares of Manhattan stock. The shares transferred by Miniger's wife and daughter had been given to them by Miniger. The three Minigers were in control of Manhattan after this transfer. The 2,500 shares of Auto-Lite stock were part of the 127,500 shares acquired by Miniger on July 17, 1922.

On January 15, 1925, Ajax assigned the Hoskin agreement to Manhattan; Manhattan delivered 2,500 shares of the common stock of Auto-Lite to Hoskin and assumed a mortgage on the Summit Street property with an unpaid principal balance of $40,000; and Hoskin conveyed such property to Manhattan. The $40,000 mortgage assumed by Manhattan was paid and discharged by April 11, 1930.

At January 15, 1925, the building included in the Summit Street property had an estimated useful life of 50 years. Two-sevenths of the total cost of the Summit Street property was allocable to the building thereon.

In 1925 Ajax had an interest in a land contract with The Huron Building Company for the purchase of property known as the Manhattan Building or the Jefferson Street property. Manhattan agreed to purchase the interest of Ajax in exchange for 1,775 shares of Auto-Lite stock. On October 1, 1925, Manhattan paid $155,000 to The Huron Building Company and received a deed to this property and on the same date mortgaged this real estate for $155,000. This mortgage was fully paid and discharged by December 21, 1929.

Miniger made a number of purchases and sales of Auto-Lite stock. As to some shares his cost is unknown.

On December 8, 1926, Manhattan issued 1,775 shares of its own stock to Miniger and his wife and daughter in exchange for 1,775 shares of Auto-Lite stock. After this exchange the three Minigers were in control of Manhattan. The shares transferred by Miniger's wife and daughter had been given to them by Miniger. On the same date Manhattan transferred the 1,775 shares of Auto-Lite stock to Ajax pursuant to the agreement made in 1925. As to 355 of these shares Miniger's cost is unknown.

On October 1, 1925, the building included in the Jefferson Street property had an estimated useful life of 50 years. Of the total cost of this property 129,250/279,250 was allocable to the building.

Manhattan filed a Federal corporation income tax return for the calendar year 1925. It reported neither gain nor loss from the exchange of 2,500 shares of Auto-Lite stock for the Summit Street

property nor from the exchange of 1,775 shares for the Jefferson Street property. It showed income of $17,573.32 derived from rentals and claimed depreciation on two buildings, one acquired December 15, 1924, at a cost of $40,000, the other acquired October 1, 1925, at a cost of $129,500.

In his income tax return for 1925 Miniger reported gain upon the sale of 4,715 shares of Auto-Lite stock claiming a cost basis of zero. In his return for 1927 he similarly reported gain on 130 shares sold. In his return for 1931 he reported gain on sale of 8,300 shares claiming a cost basis of zero for 800 shares and of $10.47 per share for 7,500 shares.

Auto-Lite stock was sold on the New York Stock Exchange in the period December 1 to 15, 1926, at prices ranging from 66½ to 68⅛ per share.

In April 1926, upon audit of the capital stock tax returns of Ajax, the respondent computed the fair market values of Auto-Lite stock held by that company at $11.50 as of June 30, 1923; $32 as of June 30, 1924; and $69.50 as of June 30, 1925. Ajax consented to assessment of and paid a deficiency in capital stock tax as proposed by the respondent upon such valuations.

Ajax made a number of purchases and sales of Auto-Lite stock in the years 1924 and 1925. In 1924 prices per share of stock purchased ranged from $50 to $57 and of stock sold from $55 to $59. In January and February 1925 prices ranged from $55 to $66. In May sales were made at $74. After September 11, 1925, prices of purchases or sales were in all cases $70 or more.

On April 5, 1945, the petitioner sold the Summit Street property for $100,000. Depreciation on that property was claimed by and allowed to Manhattan and the petitioner from January 15, 1925, through April 15, 1945, in the total amount of $7,396.03, including $33.88 for the period January 1, 1945, to April 15, 1945. Depreciation on the Jefferson Street property for the year 1945 was claimed by and allowed to the petitioner in the amount of $1,270.51.

In its return for 1945 the petitioner claimed a loss upon the sale of the Summit Street property. The respondent determined that a gain resulted from the sale. The petitioner now claims a higher basis for both the Summit Street property and the Jefferson Street property.

These two properties were acquired by the petitioner in a reorganization in 1941, when assets of other corporations were transferred to it in exchange for stock. It is agreed that this reorganization was tax free and the petitioner's basis is the basis of these properties to the preceding owner, Manhattan. The predecessor acquired the two properties in 1925 in exchange for certain shares of common stock of Auto-Lite and the assumption of liabilities. The disagreement is over the

basis to Manhattan of the Auto-Lite stock which it transferred in these exchanges.

The petitioner contends that the exchanges in January and October 1925 of Auto-Lite stock for these properties were taxable exchanges and that its basis in the properties is equal to the fair market values on those dates of the shares of stock plus the indebtedness assumed, citing sections 203 (a) and 204 (a)[1] of the Revenue Act of 1924 and section 113 (a) (7) (B) of the Internal Revenue Code of 1939.[2]

In *Champlin Refining Co.* v. *Commissioner*, (C. A. 10, 1941) 123 F. 2d 202, affirming a B .T. A. Memorandum Opinion, it was stated that where property is given in exchange for other property, the cost of the property acquired is the value of the property given in exchange therefor. The fair market value of the Auto-Lite stock in 1925 at the dates of these exchanges therefore enters into the computation of the basis of these properties to Manhattan.

Under the agreement between Hoskin and Ajax which was assigned to Manhattan, Hoskin had an option to resell the Auto-Lite stock involved to Manhattan at a price of $55 per share and the latter had an option to repurchase this stock from Hoskin at a price of $65 per share until January 1, 1928. There is no suggestion that Manhattan could not have paid the agreed price. The fair market value then could not have been less than $55 per share. *Helvering* v. *Salvage*, 297 U. S. 106 (1936). In January and February 1925 prices paid or received by Ajax ranged from $55 to $66 per share. We find the fair market value of the Auto-Lite stock in January 15, 1925, at the time of the purchase of the Summit Street property to be $60 per share.

The Auto-Lite stock was not listed on any recognized stock exchange in 1925, but its fair market value on October 1, 1925, the date of purchase of the Jefferson Street property, can be determined from the record of purchases and sales of this stock made by Ajax. From this record and other stipulated facts we find that the fair market value at that time was $70 per share.

---

[1] Sec. 203. (a) Upon the sale or exchange of property the entire amount of the gain or loss, determined under section 202, shall be recognized, except as hereinafter provided in this section.

Sec. 204. (a) The basis for determining the gain or loss from the sale or other disposition of property acquired after February 28, 1913, shall be the cost of such property * * *

[2] SEC. 113. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS.

(a) Basis (Unadjusted) of Property.—The basis of property shall be the cost of such property ; except that—

* * * * * * *

(7) Transfers to Corporation.—If the property was acquired—

* * * * * * *

(B) in a taxable year beginning after December 31, 1935, by a corporation in connection with a reorganization,

then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain or decreased in the amount of loss recognized to the transferor upon such transfer under the law applicable to the year in which the transfer was made. * * *

From these valuations the basis of Manhattan and the petitioner, its successor, in the real estate can readily be determined in a recomputation under Rule 50.

In an amended answer the respondent pleads that the petitioner is estopped from employing a cost basis other than that determined by the respondent, and alleges that the petitioner realized a gain upon acquisition of the property in 1925 which it failed to report or otherwise disclose. According to the respondent's argument the shares which Miniger acquired in 1922 in the transaction whereby he secured stock in the newly organized Electric Auto-Lite Company cost him nothing. When he acquired the assets of the Electric Auto-Lite Division of the Willys corporation and conveyed them to the new corporation, Electric Auto-Lite Company, in exchange for 250,000 shares of stock and $3,000,000 in bonds, he had then more than 80 per cent control of the new company. Hence, under section 202 (c) (3),[3] Revenue Act of 1921, no gain or loss was to be recognized from this transaction, even though he transferred shares and reduced his holdings to less than 80 per cent. Since Miniger paid for the assets out of the cash included in the assets and out of cash received from the bankers in exchange for the bonds and some of the stock, he had no outlay and the shares he retained cost him nothing. Respondent cites *Commissioner* v. *National Bellas Hess*, (C. A. 8, 1955) 220 F. 2d 415, affirming 20 T. C. 636 (1953), and *ACF-Brill Motors Co.* v. *Commissioner*, (C. A. 3, 1951) 189 F. 2d 704, affirming 14 T. C. 263 (1950). This basis of zero, says the respondent, continued to the later owners, Ajax and Manhattan, which acquired the stock from Miniger in tax-free exchanges. Manhattan did not report on its tax returns any gain derived in 1925 from its exchange of stock for the properties here involved. The respondent contends that because of this omission, the petitioner is estopped from using a basis greater than zero in computing gain or loss upon the sale in 1945 and in computing depreciation upon these properties, or if a technical estoppel is not present, at least a duty of consistency should preclude use of a higher basis, citing *Orange Securities Corporation*, 45 B. T. A. 24 (1941), affd. (C. A. 5, 1942) 131 F. 2d 662, and other cases.

The burden of proof of estoppel is upon the party alleging it. *Helvering* v. *Salvage, supra.*

---

[3] SEC. 202 (c). For the purposes of this title, on an exchange of property, real, personal or mixed, for any other such property, no gain or loss shall be recognized unless the property received in exchange has a readily realizable market value ; but even if the property received in exchange has a readily realizable market value, no gain or loss shall be recognized—

(3) When (A)₁ a person transfers any property, real, personal or mixed, to a corporation, and immediately after the transfer is in control of such corporation * * *. For the purposes of this paragraph, a person is * * * "in control" of a corporation when owning at least 80 per centum of the voting stock and at least 80 per centum of the total number of shares of all other classes of stock of the corporation.

The petitioner answers that the 1922 transaction was a taxable exchange because Miniger at no time held 80 per cent control of Auto-Lite, within the requirement of section 202 (c) (3) of the Revenue Act of 1921. This depends upon whether the transfer of assets to Auto-Lite in exchange for its stock and bonds and the transfer of stock and bonds to the underwriters were mutually interdependent transactions. The test is, were the steps taken so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series. *American Bantam Car Co.*, 11 T. C. 397 (1948), affd. (C. A. 3, 1949) 177 F. 2d 513, certiorari denied 339 U. S. 920 (1950). In the present case when the transfer of assets to Auto-Lite occurred on July 17, 1922, Miniger was under a binding contract to deliver the bonds and 75,000 shares of stock to the underwriters and to return 49,000 shares to the corporation. The contract between Miniger and the underwriters shows this clearly. Miniger could not have completed the purchase of the assets without the cash supplied by the underwriters and could not have had the cash except in exchange for the bonds and stock and could not have secured the bonds and stock except for the assets. After the exchanges Miniger had 127,500 shares, less than 80 per cent, of the voting stock. At no time did he have the right to hold more. *Wilbur F. Burns*, 30 B. T. A. 163 (1934), affirmed sub nom. *Bassick* v. *Commissioner*, (C. A. 2, 1936) 85 F. 2d 8, certiorari denied 299 U. S. 592 (1936). *Mojonnier & Sons, Inc.*, 12 T. C. 837 (1949). The 1922 transaction was taxable as the petitioner contends.

It appears that Miniger was of the opinion for some years that his basis was zero and he reported gain on sales of some of the stock accordingly. Ajax also agreed to assessment of deficiencies for 1924 and 1925 upon this basis. Apparently both the respondent and Miniger made the same mistake of law in treating the 1922 transaction as nontaxable. The respondent may not hold the petitioner to the consequences of a mutual misinterpretation. *American Light & Traction Co.*, 42 B. T. A. 1121 (1940), affd. (C. A. 7, 1942) 125 F. 2d 365.

Since the 1922 transaction was taxable, the basis of the stock to Miniger was to be measured by the fair market value of the assets exchanged for the stock. The petitioner contends that these assets had a fair market value as a going concern of about $14,000,000 in July 1922, and that the cost basis of the shares acquired by Miniger was $88.40 per share. Hence, when this stock was exchanged for property in 1925 no gain was realized but a loss was sustained, and if this was the case there can be no estoppel for the failure of petitioner's predecessor to report gain.

It is also stipulated that as to 355 shares of the stock involved in the 1925 exchanges the basis to Miniger is unknown. Since the re-

spondent cannot prove this basis, the claim of estoppel must fall as to those shares.

The act or misrepresentation relied upon by the respondent is the fact that the return for 1925 filed by the petitioner's predecessor did not report or disclose any gain resulting upon the acquisition of the properties. But it is by no means certain that gain was then realized. The petitioner contends that a loss was sustained and has introduced evidence tending to show this. However, we consider it unnecessary to determine this point, for the facts shown concerning the 1925 exchanges are not sufficient to prove estoppel or to charge the petitioner with such a duty of consistency as to bar its use of the true basis of the property acquired in 1925 in computing gain or loss or depreciation in 1945.

In *Helvering* v. *Salvage, supra*, it was indicated that a failure to disclose gain did not amount to a false representation of fact.

The petitioner's predecessor treated the transactions in 1925 as though no gain or loss resulted. Whether this was a mistake it is not necessary now to decide. The respondent has not proved that a gain resulted. Nor does it appear that the facts were not available to the respondent within the limitations period. See *Brooklyn City Railroad Co.*, 27 B. T. A. 77 (1932), affd. (C. A. 2, 1934) 72 F. 2d 274.

In *Commissioner* v. *Dwyer*, (C. A. 2, 1953) 203 F. 2d 522, affirming a Memorandum Opinion of this Court, it was stated that—

it is established by the great weight of authority that, if a taxpayer has not misrepresented or suppressed the facts, the statute of limitations not only prevents any reassessment of the tax after the prescribed period has passed; but that the Treasury may not assess a tax for a later year to make up for a credit erroneously allowed, or a charge erroneously omitted, in an earlier year.

In *Richard K. Mellon*, 12 T. C. 90 (1949), affd. (C. A. 3, 1950) 184 F. 2d 157, we rejected the argument that the taxpayers were under a duty of consistency which, after the statute of limitations barred collection of taxes for an earlier year, prevented them from maintaining a different position to gain an increased basis. See also *Sugar Creek Coal & Mining Co.*, 31 B. T. A. 344, 348 (1934); *American Light & Traction Co., supra*; *Joyce* v. *Gentsch*, (C. A. 6, 1944) 141 F. 2d 891; and *Crosley Corporation* v. *United States*, (C. A. 6, 1956) 229 F. 2d 376. The facts here do not show any misrepresentation by Manhattan or the petitioner or that the respondent was misled into some action or inaction in reliance upon their conduct.

The petitioner is entitled to compute gain or loss and depreciation in 1945 using the fair market values of the stock at the time of the exchanges in 1925 as we have determined those values.

*Decision will be entered under Rule 50.*