**Thomas P. STANTON and Wanda S. Stanton**

v.

**UNITED STATES of America, Appellant.**

**No. 74–1530.**

United States Court of Appeals, Third Circuit.

Argued Jan. 24, 1975.

Decided March 3, 1975.

Scott P. Crampton, Asst. Atty. Gen., Gilbert E. Andrews, Ernest J. Brown,

William A. Friedlander, Attys., Tax Div., Dept. of Justice, Washington, D. C., for appellant; Robert E. J. Curran, U. S. Atty., Robert J. Stout, Asst. U. S. Atty., of counsel.

Eugene R. Lippman, Thomas A. Bell, Krusen, Evans & Byrne, Philadelphia, Pa., for appellees.

Before VAN DUSEN, GIBBONS and HUNTER, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Circuit Judge.

The United States appeals from a final judgment in favor of taxpayers Thomas P. Stanton and Wanda S. Stanton for a refund of income tax paid for the tax year 1966.[1] The claimed overpayment depends upon the proper tax treatment to be afforded to Mr. Stanton's 1966 decision to terminate a Subchapter R election[2] which he had made in 1964. By virtue of that election his sole proprietorship, Stanton Refractory Sales Company, was taxed as if it were a corporation. Stanton chose to terminate because Congress, in 1966, had repealed the provision in the Internal Revenue Code which had permitted the election. Act of April 14, 1966, Pub.L. No. 89–389, § 4, 80 Stat. 115, amending Int.Rev.Code § 1361 (now Int.Rev.Code § 1361(n)). The repealing legislation provided that any election not terminated on or before December 31, 1968 would be terminated by operation of law on January 1, 1969. Taxpayers were given the right to terminate Subchapter R elections voluntarily by the December 31st date.

Along with his decision to terminate, which was made as of November 1, 1966, Stanton decided to form a new corporation. This decision grew out of discussions he had had, prior to the termination date, with E. M. Harvey, President of North State Pyrophyllite Co., a North Carolina refractory manufacturer. The proprietorship was the exclusive sales representative for North State to both the United States and Canadian steel industries. The discussions dealt with the desirability of incorporating so that there would be continuity in the operation of the business in the event of Stanton's death. Harvey had expressed the preference that Mrs. Wanda Stanton, who was an active participant in the business of the proprietorship, have an ownership interest in any corporation that might be formed. But there were other motivations for incorporation unrelated to Mrs. Stanton.[3]

As planned, Stanton was to transfer some, but not all, of the assets of the Subchapter R proprietorship to the new corporation, and Mrs. Stanton was to receive 49% of the newly-issued stock. This was precisely how the new corporation was formed. On November 1, 1966, the date of the Subchapter R termina-

---

1. The decision of the district court is reported. Stanton v. United States, 371 F.Supp. 103 (E.D.Pa.1974).

2. The election was made pursuant to Int.Rev. Code § 1361.

3. The parties stipulated and the district court found:

    "Plaintiff formed the formal corporation after discussion with his advisers for the following business purposes: (1) organization of a business entity with nominal paid-in capital to facilitate the transfer of business to employees upon retirement, and (2) the adoption of a profit sharing plan whose benefits to employees would be substantially in excess over those permitted to a sole proprietorship." 371 F.Supp. at 105.
    The district court also found:

    "In 1965, as set forth in the uncontested affidavit of E. M. Harvey, President of North State, Mr. Harvey and Mr. Stanton discussed the desirability of incorporating Stanton Refractory Sales Company in order to provide business continuity in the event of Mr. Stanton's death.
    Also, Mr. Stanton wished to incorporate his business for the purpose of facilitating the transfer of the enterprise to employees of the business upon his retirement and to permit the adoption of a profit sharing plan in order to encourage employee loyalty and incentive. These are both valid business purposes and are uncontested as such by the government.
    The final motivating force behind incorporation was the fact that Mr. Stanton faced automatic termination of his 1361 election on January 1, 1969. The obvious answer was incorporation." Id. at 110–11.

tion, Stanton caused the incorporation of Stanton Refractories, Inc., and transferred the operating assets of the proprietorship to it. The stock of the corporation was issued 51% to Mr. Stanton and 49% to Mrs. Stanton. The opening balance sheet of the corporation, as of November 1, 1966, reflected the following:

### ASSETS

| | |
|---|---|
| Cash | $ 8,261.83 |
| Accounts Receivable | 4,263.97 |
| Inventory | 39,144.74 |
| Furniture and Equipment (Net of depreciation) | 10,242.75 |
| Insurance Deposit | 140.00 |
| Telephone Deposit | 100.00 |
| **TOTAL ASSETS** | **$62,153.29** |

### LIABILITIES:

| | | |
|---|---|---|
| Accounts Payable | | $50,406.33 |
| Accrued Taxes | | 1,746.96 |
| Net Equity | | |
| Capital Stock | $10,000 | |
| Retained Earnings | 0 | |
| | | 10,000.00 |
| **TOTAL LIABILITIES** | | **$62,153.29** |

The consideration for the $10,000 in capital stock came entirely from the assets transferred from the Subchapter R proprietorship. As of October 31, 1966, the balance sheet of the Subchapter R proprietorship was as follows:

### ASSETS

| | |
|---|---|
| Cash | $122,314.41 |
| Accounts Receivable | 45,561.18 |
| Inventory | 39,144.74 |
| Furniture and Equipment (Net of depreciation) | 10,242.75 |
| Insurance Deposit | 140.00 |
| Telephone Deposit | 100.00 |
| **TOTAL ASSETS** | **$217,503.08** |

### LIABILITIES

| | | |
|---|---|---|
| Accounts Payable | | $ 50,406.33 |
| Accrued Payroll Taxes | | 1,746.96 |
| Provision for Federal Income Taxes | | 4,933.52 |
| Equity: | | |
| Paid-In Capital | $22,067.54 | |
| Retained Earnings | 138,348.73 | |
| | | 160,416.27 |
| **TOTAL LIABILITIES** | | **$217,503.08** |

Thus the effect of the termination of the election was that the corporation received all the proprietorship's furniture and equipment, its deposits and inventory and sufficient cash and accounts receivable, such that the value of these assets equalled the value of the accounts payable and accrued payroll taxes assumed plus the value of the capital stock. Stanton retained $114,052.58 in cash and $41,297.21 in accounts receivable, and assumed liability for Subchapter R federal income taxes in. the amount of $4933.52. On their 1966 return the taxpayers reported a long term capital gain on the liquidation of the Subchapter R proprietorship in the amount of $138,-348.73. This sum was equal to the retained earnings of the proprietorship, an amount we note was the equivalent of the earned surplus of a corporation. Stanton's basis for the assets of the proprietorship was $22,067.54, an amount which was the equivalent of the paid-in capital of a corporation. The Internal Revenue Service treated the transaction as resulting in a taxable dividend in the amount of the claimed capital gain and assessed a deficiency of $48,104.65 in income tax for the year 1966. This amount with interest was paid on April 8, 1970, and a claim for a refund in the amount of $56,673.20 followed, resulting in the instant suit.

▆ It is the taxpayers' position that termination of the election must be treated as a corporate liquidation. They rely on Int.Rev.Code § 1361(*l*) which provides:

"A distribution in partial or complete liquidation with respect to a proprietorship or partnership interest by an enterprise as to which an election has been made under subsection (a), shall be. treated as a corporate liquidation in accordance with part II of sub-

chapter C [§§ 331–346] of this chapter."

Treatment as a liquidation under Int. Rev.Code § 331 would result in a long term capital gain in the amount reported. The government concedes that this would have been the effect of the termination of election prior to the enactment of the repealing legislation if a termination had then been possible. A major reason for the repeal of Subchapter R was that sole proprietorships were not often exercising the option. 7 CCH 1975 Stand.Fed.Tax Rep. ¶ 4845A.01. This in turn was probably because the tax-free reorganization provisions of the Code were practically unavailable to electing proprietors who wanted to change to the corporate form of doing business. *See* Estate of Wein v. Commissioner of Internal Revenue, 330 F.2d 957 (3d Cir. 1964), aff'g 40 T.C. 454 (1963). As originally structured § 1361(m) provided that, with stated exceptions, an enterprise as to which a Subchapter R election had been made could not be considered a corporation, nor its proprietors nor partners be considered shareholders, for purposes of the Internal Revenue Code provisions relating to corporate reorganizations. The 1966 legislation repealed § 1361(m). The legislative history makes clear that terminations of Subchapter R elections made on or after April 14, 1966, the date of enactment, and before the cut-off date of January .1, 1969, were intended to be covered by the reorganization provisions of the Code.[4] A Subchapter R enterprise could have been liquidated, as if it were an actual corporation, and the proceeds in liquidation would have been afforded capital gains treatment pursuant to Int.Rev.Code § 331. The enterprise could have been transferred completely in a tax-free reorganization to a corporation controlled by the old owners.

---

**4.** "Thus, for example, if after the date of enactment and before January 1, 1969, the partners of an enterprise, which has a valid election in effect under section 1361(a) transfer all of the assets of such enterprise to an actual corporation and receive stock in proportion to their interests there will be no tax on the transfer of property and on the is-

suance of stock, under sections 368(a)(1) and 354 of the code. On the other hand, if the partners retain money or property of the enterprise, this may be treated as 'boot' for purposes of section 356 of the code." 2 U.S. Code Cong. & Admin.News, 89th Cong., 2d Sess., p. 2162 (1966).

But, just as in the case of a corporation, the owners of a Subchapter R enterprise could not achieve the transfer of that enterprise to a corporation controlled by them while at the same time distributing earned surplus at capital gains rates. The government contends that the November 1, 1966 transactions were a reorganization within the meaning of Int. Rev.Code § 356 and that the property retained by Stanton was "boot". In a reorganization this "boot" is taxable as ordinary income at least to the extent it represents earned surplus.

The taxpayers, recognizing that a liquidation of a Subchapter R enterprise followed by a transfer of the enterprise to a corporation controlled by the former owner may, since April 4, 1966, be classified as a corporate reorganization, urge that the November 1, 1966 transactions were nevertheless a liquidation-reincorporation rather than a reorganization. The argument is based on the contention that the transactions did not meet any of the reorganization definitions set out in Int.Rev.Code § 368. This position was accepted by the district court. It rejected the government's principal contention [5] that the transactions constituted a reorganization as defined in Int. Rev.Code § 368(a)(1)(D). That subsection reads as follows:

> "[A] transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor, or one or more of its shareholders (including persons who were shareholders immediately before the transfer), or any combination thereof, is in control of the corporation to which the assets are transferred; but only if, in pursuance of the plan, stock or securities of the corporation to which the assets are transferred are distributed in a transaction which qualifies under section 354, 355, or 356 [is a reorganization]."

The court held that Mrs. Stanton's ownership of 49% of the stock of the new corporate enterprise, Stanton Refractories, Inc. prevented Stanton from having the requisite 80% control of that enterprise as required by the definition of "control" found in Int.Rev.Code § 368(c):

> "For purposes of part I (other than section 304), part II, and this part, the term 'control' means the ownership of stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote and at least 80 percent of the total number of shares of all other classes of stock of the corporation."

The district court emphasized the undisputed fact that Stanton had a sound business purpose for giving his wife, an active participant in his business, a percentage of stock which would reassure his supplier of her continued participation. But in looking only at the percentage of ownership which resulted from that gift, the court disregarded what the government contends is the controlling reality; that at the time of the transfer of the operating assets from the Subchapter R enterprise to the new enterprise Stanton had the absolute right to designate who would receive all the stock. That his business judgment strongly suggested the wisdom of a gift of 49% to his wife in no way lessened his control.

A closely analogous case is American Bantam Car Co. v. Commissioner of Internal Revenue, 177 F.2d 513 (3d Cir. 1949), affirming per curiam and adopting the reasoning of 11 T.C. 397 (1948).[6] In that case the transfer of assets to a new corporation for 300,000 shares of stock took place on June 3, 1936. Five days later the new corporation executed an underwriting agreement pursuant to which the underwriters would receive up to 100,000 shares of the shareholders' common stock as and if preferred stock was sold. The underwriters received 87,-

---

**5.** The government also contended at one stage or another that the transaction was a "C" or an "F" reorganization. Int.Rev.Code § 368-(a)(1)(C), (F). The "F" contention apparently has been abandoned. Because we conclude there was a "D" reorganization we do not reach the "C" contention raised for the first time in this appeal.

**6.** Certiorari was denied. 339 U.S. 920, 70 S.Ct. 622, 94 L.Ed. 1344 (1950).

900 shares of common stock by October 1937. The Tax Court held that in June 1936 the stockholders had the requisite control even though prior to the transfer of assets it was contemplated that a preferred stock underwriting would be attempted. The reality was that as of June 1936 the stockholders could have called off the underwriting. Thus there was a tax-free reorganization.

Another closely analogous case is Wilgard Realty Co. v. Commissioner of Internal Revenue, 127 F.2d 514 (2d Cir.), cert. denied, 317 U.S. 655, 63 S.Ct. 52, 87 L.Ed. 527 (1942). There the transferor acquired all the stock of a new corporation. It was his intention to give away three-fourths of that stock to members of his family on the same day as he received it and after the transfer of assets took place. The gifts were, in fact, made. The court held that a tax-free exchange had taken place:

"In the absence of any restriction upon his freedom of action after he acquired the stock, he had 'immediately after the exchange' as much control of the petitioner as if he had not before made up his mind to give away most of his stock and consequently his control." *Id.* at 516.

*See also* Manhattan Building Co., 27 T.C. 1032 (1957); B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders ¶ 3.10 (3d ed. 1971).

Taxpayers rely heavily on Fahs v. Florida Machine & Foundry Co., 168 F.2d 957 (5th Cir. 1948). That case is clearly distinguishable. The issue was the transferee corporation's basis for certain real estate it had sold. If it had acquired the real estate in a tax-free exchange it had the same basis as the transferor, rather than the higher basis for which it contended. Whether the exchange was tax-free depended, in turn, on whether one of two stockholders was in control when the transfer was made. The stockholders were father and son. The father owned a machine shop conducted as a proprietorship. Its assets included the real estate. In 1921, in order to induce the son, an engineer, to stay with the business, the father entered into an agreement whereby the son would eventually receive a one-half interest if he did stay. In 1924, and pursuant to that agreement, the transferee corporation was formed. The father transferred all the proprietorship assets to it, and the stock was issued one-half to him and the other half (except for 3 qualifying shares) to the son. The government contended that the father was in control. The Fifth Circuit held:

"We are of [the] opinion the district court's finding that Franklin Russell, Senior, was not in 'control' of taxpayer corporation 'immediately after the transfer' on July 16, 1924 and therefore, that Section 112(b)(5) did not apply, is abundantly supported by the evidence." *Id.* at 959.

The evidence, of course, was that unlike Stanton, Franklin Russell, Sr. had undertaken by a contract supported by consideration, prior to the transfer, to give his son one-half the business. Thus he did not at the time of the transfer have the absolute right to designate who would receive all the stock in the transferee. That distinction suffices, and we need not consider whether, as the government contends, *Fahs* was erroneously decided since Franklin Russell, Jr. was in practical effect, a 50% owner of the transferred enterprise. That would, of course, have caused the aggregation of his and his father's control, and have made the reorganization tax-free. Even if the record supported a finding that prior to November 1, 1966 Mrs. Stanton had acquired in some binding manner a 49% interest in the transferred enterprise (and nothing in the record so suggests) we would be inclined to agree with the government that in such case her interest and that of her husband would be aggregated for purposes of § 368(c).

■ We recognize that by attempting to ameliorate the lot of one group of unwary Subchapter R taxpayers Con-

gress, in repealing Int.Rev.Code § 1361, erected a snare for another in which the Stantons became enmeshed. The taxpayer could, however, have liquidated his Subchapter R enterprise with long term capital gain consequences had he foregone the benefits of carrying on the same enterprise in corporate form. He could also have transferred all of the assets of the enterprise to a successor corporation in a tax-free reorganization. He could not, following such a transfer, have distributed earned surplus at long term capital gain rates. The "boot" provisions in the reorganization sections of the Code are designed to prevent the equivalent of such a distribution in connection with partial transfers in reorganization.

The judgment of the district court will be reversed.