Rufus F. Turner and Marguerite H. Turner v. Commissioner.
Turner v. Commissioner
Docket No. 82122.
United States Tax Court
T.C. Memo 1961-101; 1961 Tax Ct. Memo LEXIS 256; 20 T.C.M. (CCH) 468; T.C.M. (RIA) 61101; March 31, 1961
Fortescue W. Hopkins, Esq., and William N. Pierce, Esq., Mountain Trust Bank Bldg., Roanoke, Va., for the petitioners. Richard C. Forman, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The Commissioner determined a deficiency in petitioners' income tax for 1957 in the amount of $11,670.36. The issues presented are (1) whether there was a recognized gain upon the incorporation of a sole proprietorship; and (2) whether a bonus received in 1957 was properly reported in that year for income tax purposes. Findings of Fact Some of the facts have been stipulated and are incorporated herein by reference. Petitioners are husband and wife and reside in Martinsville, Virginia. For the calendar year 1957 they filed a joint income tax return with the director of internal revenue for the district of Virginia. Rufus F. Turner, hereinafter referred to as petitioner, as a sole proprietor, had engaged in the operation of a fresh produce wholesale grocery business for 36 years in Martinsville under the name of Cash Produce Company. Also associated with the business were petitioner's wife, Marguerite H. Turner, who had been employed *258 for 26 years as a bookkeeper, and James R. Ingram, petitioner's son-in-law, who had been employed for 7 years and was petitioner's principal assistant. On November 14, 1956, petitioner incorporated the sole proprietorship under the name of Cash Produce Company, Inc., hereinafter referred to as Cash Produce. The corporation transacted no business until January 1, 1957. A stock statement was filed with the Virginia State Corporation Commission on December 6, 1956, advising it of a plan to issue 135 shares of common stock for $6,750 in cash. Also in December 1956, petitioner conferred with his attorney and his certified public accountant with respect to the manner in which to accomplish the proposed transfer of the proprietorship assets to the new corporation. At that time the accountant made the following computation of the proprietorship goodwill Net earnings (before income taxes) -
1952
$ 29,887.34
1953
18,468.80
1954
19,536.61
1955
24,830.86
1956
21,535.87
Total
$114,259.48
Less income taxes - 25%
average
28,564.87
Total net earnings
$ 85,694.61
5 year average
$ 17,138.92
Net earnings capitalized at 10%
$171,389.20
Less net invested capital at 12-31-56
excluding goodwill (75,534.48 +
21,535.87)
97,070.35
Goodwill at date of incorporation
$ 74,318.85
Rounding off
$ 74,300.00
*259 On January 1, 1957, with the exception of real estate and certain other fixed assets, all of the assets of the sole proprietorship together with certain liabilities were transferred to Cash Produce in exchange for 1,365 shares of common stock. These assets had a cost basis of $49,593.46. A summary of the balance sheet of the proprietorship as of December 31, 1956 was as follows: Current Assets
$ 47,077.44
Fixed Assets
$ 91,455.07
Less Depreciation
36,490.09
54,964.98
Other Asset
230.10
TOTAL ASSETS
$102,272.52
Current Liabilities
$ 5,202.17
R. F. Turner, Capital: Balance 1-1-56
$116,013.78
Earnings for year
1956
21,535.87
$137,549.65
Drawings for 1956
40,479.30
97,070.35
TOTAL LIABILITIES
$102,272.52
The following is the opening journal entry as of January 1, 1957 on the books of Cash Produce prepared by its attorney: Debit
Cash
$ 9,092.61
Accounts receivable
12,339.46
Inventory
25,645.37
Store fixtures
996.30
Cars and trucks
20,273.91
Office equipment
3,111.87
Frigidaire air conditioners
620.21
Incorporation expense
230.10
Goodwill
74,300.00
Credit
Reserve for depreciation -
Store fixtures
$ 481.53
Cars and trucks
15,449.23
Office equipment
1,433.56
Air conditioners
149.88
Accounts payable - trade
2,312.01
Reserve for withholding tax
625.02
Accrued salaries
2,024.58
Accrued social security taxes
240.56
Note payable - R. F. Turner
48,893.46
Capital stock subscribed
68,250.00
Capital stock issued
6,750.00
*260 To record acquisition of business assets from R. F. Turner in exchange for capital stock of the corporation and account due R. F. Turner. A financial statement for Cash Produce as of January 1, 1957 was prepared by the accountant on January 19, 1957, and transmitted to the Produce Reporter Company, Wheaton, Illinois which publishes a credit rating reference book of produce firms. The following is the balance sheet from that financial statement: CURRENT ASSETS
Cash
$ 9,092.61
Accounts receivable - customers
12,339.46
Merchandise inventory - at the lower of cost (determined by the
first-in-first-out method) or market
25,645.37
$ 47,077.44
FIXED ASSETS
Store fixtures, furniture, equipment and vehicles - at cost
$25,002.29
Less accumulated depreciation
17,514.20
7,488.09
INTANGIBLE ASSETS
Good Will
$74,300.00
Incorporation expense
230.10
74,530.10
TOTAL ASSETS
$129,095.63
CURRENT LIABILITIES
Accounts payable: Trade
$2,312.01
Other
625.02
$ 2,937.03
Accrued liabilities: Salaries and wages
$2,024.58
Taxes (other than taxes on income)
240.56
2,265.14
$ 5,202.17
NONCURRENT LIABILITY
Note payable to officer - unsecured and without interest
$ 48,893.46
CAPITAL
Common stock - authorized, 3,000 shares of $50 par value; issued
and outstanding, 135 shares
$ 6,750.00
Subscriptions to common stock, 1,365 shares
68,250.00
75,000.00
TOTAL LIABILITIES
$129,095.63
*261 Thereafter petitioner received the following reply from the Produce Reporter Company in regard to the financial statement submitted: The statement of Cash Produce Company, Inc., does present several problems from a rating standpoint. The item of "good will" is very correctly listed as a "intangible asset", it is the type asset which is eliminated from credit consideration in arriving at Blue Book financial ratings. When your good will and incorporation expenses of $74,530.10 are eliminated from your statement, that January 1, 1957 Corporation financial statement then shows a net worth of less than $500. We believe we have a feel of what your accountant and tax attornies [attorney] have attempted to accomplish in handling your incorporation on a basis which provides for a corporation note payable "to officer" of $48,893.46. Such an arrangement does, however, deplete completely the corporation's financial responsibility for credit rating purposes. Your accountant can, of course, advise you on the advisability of issuing corporate stock for that indebtedness to officers. Frankly, Mr. Turner, we hesitate very much to recommend a subordination agreement covering the notes *262 payable to officers and do so only as a last resort. In the event your accountants or attornies would want to prepare a subordination agreement which would clearly set forth that no payments are to be made on indebtedness to officers as long as there are any trade obligations and indicate clearly that you will notify Produce Reporter Company prior to the time any payment is made on that indebtedness, then such a subordination agreement could be accepted. It is the type exception, however, which is "loaded" with possibilities of misunderstanding for the future. * * *
In response to this letter petitioner wrote the following: As principal stockholder, president and manager of Cash Produce Co., Inc. the undersigned will continue to honor credit extension with the same integrity and ability as in the past, and to personally guarantee payment of the corporations debts in the same manner as prior to incorporation. Though you suggest in your letter that a subordination agreement as to the corporations debt to me is "loaded" with possibilities of misunderstanding, you may accept this letter over my signature below as such an agreement, to the effect that any trade obligations *263 will most certainly be paid before any liquidation of this debt. Any drawings I made from the corporation above the minimal salary allowance provided for me will be charged against my annual profit-sharing. Furthermore, your letter ignored the fact that the note payable to officer of $48,893.46 was created by the charge for goodwill, and that the goodwill was a capitalization at 10% of the average net profits of the past five years. * * * Nevertheless, to eliminate goodwill from credit consideration as you state, should also require elimination of the debt which it created,leaving a remaining net worth of $49,363.36. To the latter should be added, if not more, by the subordination described above, the value of the business real estate which I retained in my own right in the amount of $47,476.89, giving a total net worth for credit purposes (Excluding other personal assets) in the amount of $96,840.25, exclusive of goodwill. * * *
As evidence of the $48,893.46 designated on the balance sheet submitted to the Produce Reporter Company as "NONCURRENT LIABILITY, Note Payable to officer - unsecured and without interest", the accountant prepared the following instrument which was *264 executed sometime between January and November 1957: Notice of Indebtedness January 1, 1957 For value received, We, Cash Produce Co., Inc., do hereby promise to pay to Mr. Rufus F. Turner, his heirs or assigns, the amount of Forty-eight thousand, eight hundred, ninety-three dollars and forty-six cents, ($48,893.46) without interest, payable at the office of the corporation on or after February 1, 1958; also the corporation is not to furnish security of any type for this indebtedness. It is also agreed that the payee may draw funds from the corporation at any time upon the pledge of this note as security, said drawings to be deducted from the amount of this liability prior to settlement. Accepted and agreed to the above this date January 1, 1957. (S) Rufus F. Turner / Payee Cash Produce Co., Inc. (S) Rufus F. Turner / Registered Agent President This instrument was not adopted or ratified by any formal resolution of the stockholders or the board of directors of Cash Produce. A meeting of the board of directors of Cash Produce was held on February 25, 1957. Relevant parts of the minutes of that meeting are as follows: WHEREAS, Rufus F. Turner, sole proprietor and owner, *265 trading and doing business previously as the Cash Produce Company, Martinsville, Virginia, has the below mentioned personal property assets of $129,095.63, and said Rufus F. Turner, owner and sole proprietor, being subject to liabilities of $54,095.63, he having previously purchased for cash 135 shares at $50.00 per share for $6750.00 cash; therefore, total liabilities outstanding by purchase of said stock being the sum of $60,845.63, and the difference between said assets and liabilities being net assets and net worth of $68,250.00, and he has offered to sell the personal assets of said Cash Product [Produce] Company for the below sum, subject to said liabilities, with the remaining value in net assets and worth of $68,250.00 to the Cash Produce Company, Incorporated payable in common stock of the corporation, representing the difference between the assets subject to said liabilities. WHEREAS the said Rufus F. Turner, owner, has offered to transfer the said current, fixed and intangible personal property assets of said Cash Produce Company with the assumption of said liabilities to the Cash Produce Company, Incorporated, in exchange for $68,250.00 to be paid in 1365 shares of *266 the capital stock of the corporation of the par value of $50.00 each, and it is necessary for this Board of Directors to determine the value of such property in current money of the United States of America, as well as to accept or reject the said offer: NOW THEREFORE, BE IT RESOLVED: First, that this Board, in the exercise of its best skill and judgment, fixes and determines the value of the said property in current money of the United States in accordance with the Financial Statement of Cash Produce Company, Incorporated of January 1, 1957, as successor to Cash Produce Company (Rufus F. Turner, sole proprietor) on January 1, 1957, prepared by Alexander Grant & Company, certified public accountants of Roanoke, Virginia on January 19, 1957 and said Statement of the valuation of the assets and liabilities as set forth in said Statement, a copy of which is hereby attached and incorporated in the within resolutions and said balance sheet of said assets and liabilities of said Statement is hereby adopted as follows: [This balance sheet is identical with the one submitted to Produce Reporter Company, set out above.] Second, that the said offer of the said Rufus F. Turner, owner, *267 trading as the Cash Produce Company, Martinsville, Virginia, be and the same hereby is, accepted, in the sale of the above valued assets of $129,095.63, subject to the liabilities of $54,095.63, to the Cash Produce Company, Incorporated, and that 1365 shares of the common stock of the par value of $50.00 each in the total sum of $68,250.00 of said Corporation be issued, (in addition the amount $6750.00 has previously been issued to him by said Corporation for cash) and the remaining amount of $68,250.00 now be issued to Rufus F. Turner by said Corporation, to cover the actual net worth and net assets as shown in the First Resolution above. A fiscal year ending July 31 was adopted by Cash Produce. Petitioner's wife, as bookkeeper, incorrectly credited the $48,893.46 to "Accounts Payable" and subsequently certain drawings of petitioner were debited to this account with the result that the financial statement of Cash Produce for its fiscal year disclosed notes payable as $42,090.29. This error was corrected in January 1958 when the accountant audited petitioner's drawing account in preparation of the joint income tax return. On November 15, 1957, the accountant left the firm by which *268 he had been employed and shortly thereafter opened his own office in Martinsville. On January 1, 1958, petitioner and Cash Produce became the accountant's clients. On or about January 8, 1958, the accountant's immediate supervisor of his former firm telephoned him and also advised petitioner by letter that the incorporation of Cash Produce was, in the supervisor's opinion, taxable rather than tax free. On January 14, 1958, a debenture bond in the amount of $48,893.46 issued by Cash Produce to petitioner was filed with the Virginia State Corporation Commission. Although this debenture bond was dated January 1, 1957, it was prepared by Cash Produce's attorney from a form supplied by the accountant a few days prior to the filing. Pertinent provisions of this debenture bond are as follows: Cash Produce Company, Incorporated, a Corporation organized and existing under the laws of the State of Virginia, (hereinafter called the "Corporation"), for value received, hereby promises to pay to Rufus F. Turner, or order, his heirs or assigns, the total sum of $48,893.46, bearing interest at three per cent (3%) per annum, and being payable as follows: $5,000.00 on January 1, 1962, and $5,000.00 *269 on the first day of each year thereafter until the total sum of $48,893.46 herein owed is paid unto the said Rufus F. Turner, or order, his heirs or assigns, together with 3% interest per annum and with the first payment of interest being due and payable on said sum on January 1, 1958 and on the first day of each year thereafter. The issue of the within corporate debenture is made and executed pursuant to the articles of incorporation of the said Corporation and in pursuance of a resolution of said Corporation passed on the 1st day of January, 1957 and said debenture herein being debenture No. 1. * * *
This debenture is of an authorized issue debenture due as hereinabove set forth of the Corporation (hereinafter called debenture) of the aggregate principal amount of Forty-Eight Thousand Eight Hundred Ninety-Three Dollars and Forty-Six Cents ($48,893.46), duly authorized by resolution of the Board of Directors of the Corporation adopted January 1, 1957. The liability reflected in the debenture bond was recorded on the books of Cash Produce by the accountant as a "Long-Term Liability" with the explanation "Indenture due Rufus F. Turner from transfer of assets at date of incorporation. *270 " Although entered on the books in January 1958 it was dated January 1, 1957. One of the closing journal entries of Cash Produce for the fiscal year ended July 31, 1957 was as follows: Officers' salaries
$12,000.00
Payroll taxes
55.12
Social security tax payable
$ 110.25
Withholding taxes
1,919.88
R. F. Turner - accounts payable
24.99
Capital stock
10,000.00
To record additional salary paid to
R. F. Turner in corporate common
stock.
A "Stock Statement" dated January 10, 1958 was filed with the State Corporation Commission. It recited that "200 shares common stock at $50.00 per share in one issue [were] to be issued for * * * $10,000 in cash." The Commissioner explained in the statement accompanying the statutory notice of deficiency: It is held that you realized a gain of $74,300.00, recognized as a long-term capital gain to the extent of $48,893.46 (taxable at 50%), which represents the fair market value of non-interest bearing note received as part payment in the transfer of your net equity in assets to the Cash Produce Company, Incorporated. Therefore, taxable income has been increased in the amount of $24,446.73. In an amended *271 petition petitioners allege that they erroneously reported as income in 1957 stock or a bonus in the amount of $10,000. Opinion The tax incidents of a transfer of property to a new corporation are ascertained by reference to section 351, [1] Internal Revenue Code of 1954, which is a substantial re-enactment of section 112(b)(5) of the 1939 Code. Under section 351 the recognition of gain or loss at the time of incorporation is postponed if the transfer complies with the requisites of the statute which were framed in light of the underlying philosophy of the section, that an incorporation is a mere change in the form of doing business. Section 351 provides, in effect, that "no gain or loss shall be recognized" on the transfer of property to a corporation if (1) the transfer is "solely in exchange for stock or securities in such corporation" and (2) the transferor has an 80 per cent control of such corporation "immediately after the exchange." Section 351(b) contains a caveat that if property other than stock or securities permitted to be received without the recognition of gain or loss is obtained in the exchange, any gain on the transfer shall be recognized, *272 but "not in excess of" the fair market value of such "other property" or if money, the amount of money received. No loss shall be recognized. *273 In the instant case, the Commissioner determined that petitioner received in the incorporation of Cash Produce not only "nonrecognition" property, but also "other property" in the form of a non-interest bearing note in the amount of $48,893.46. He determined further that the petitioner had realized a gain of $74,300 on the transfer and consequently there was a recognized gain taxable as a long-term capital gain to the full extent of the face value of the note. In contesting the Commissioner's determination the petitioner argues (1) that the incorporation was entirely tax free as the "Notice of Indebtedness" was not a legal instrument, but only a memorandum prepared for petitioner's personal satisfaction until a debenture bond was issued and that the petitioner's receipt of such debenture bond on January 14, 1958 was an integral and concluding step in the plan of incorporation; (2) that the notice of indebtedness does not constitute "other property" within the concept of section 351; (3) that even if the notice of indebtedness is "other property" it had no fair market value; (4) that if it is "other property" and in addition had a fair market value, nevertheless no gain was realized *274 upon the receipt of the stock and "other property" because the value of the property received was not in excess of the net adjusted cost basis of the tangible assets transferred; and (5) that the notice of indebtedness represented an equity interest equivalent to stock. The petitioner's initial proposition is that the transactions were merely steps in a "single scheme" of incorporation. The question of whether a transaction is a part of a preconceived plan of incorporation is primarily factual. In Manhattan Building Co., 27 T.C. 1032 (1957) we said, at page 1042: "The test is, were the steps taken so interdependent that the legal relations created by one transaction would have been frutless without a completion of the series." See also ACF-Brill Motors Co., 14 T.C. 263 (1950), affd. 189 F. 2d 704, certiorari denied 342 U.S. 886 (1951). In the instant case the resolution of this question turns upon the legal effect of the notice of indebtedness. Petitioner claims it had no legal significance, but was merely a memorandum prepared for *275 his personal satisfaction until the issuance of the debenture bond. The Commissioner, on the other hand, says it was a note issued in conjunction with the incorporation and had no relation to the subsequent issuance of the debenture bond. Although labeled a "Notice of Indebtedness", the instrument provided that For value received, We, Cash Produce Co., Inc., do hereby promise to pay to Mr. Rufus F. Turner, his heirs or assigns, the amount of Forty-eight thousand, eight hundred, ninety-three dollars and forty-six cents, ($48,893.46) without interest, payable at the office of the corporation on or after February 1, 1958; also the corporation is not to furnish security of any type for this indebtedness. It is also agreed that the payee may draw funds from the corporation at any time upon the pledge of this note as security, said drawings to be deducted from the amount of this liability prior to settlement. Accepted and agreed to the above this date January 1, 1957. (S) Rufus F. Turner / Payee Cash Produce Co., Inc. (S) Rufus F. Turner / Registered Agent President As can be seen, no reference to an execution of a debt obligation in the future was embodied in the so-called *276 "Notice of Indebtedness", and though there may be some doubt as to its negotiability, the instrument on its face appears to be more than a memorandum as it contains all the indicia of an enforceable obligation to pay money. Virginia Code § 8-509. [2] There also seems to be an inconsistency between the label of the instrument and its designation as a "note" in the body of the writing. Inasmuch as such a construction is contrary to the intent of petitioner as testified to at the trial, it is necessary to examine the surrounding facts and circumstances to ascertain if they substantiate petitioner's contention. Under the terms of the notice of indebtedness petitioner could "draw funds from the corporation at any time upon the pledge of [the] note as security, said drawings to be deducted from the amount of [the] liability prior to settlement". This is in essence a drawing account *277 of $48,893.46 as petitioner could draw funds up to that aggregate amount from the corporation. Petitioner disaffirms any intention of withdrawing such amounts; however, an examination of the balance sheet of the sole proprietorship in 1956 discloses that petitioner's drawing in that year exceeded $40,000. The fact that no withdrawals were made in 1957 can be explained by the subordination agreement petitioner entered into with Produce Reporter Company. Petitioner was quite concerned about maintaining a high credit rating which, from the testimony, was deemed to be a necessity in the produce business. The correspondence between petitioner and Produce Reporter Company in the findings of fact clearly illustrates that petitioner could make no withdrawals without seriously impairing the corporation's credit standing. Petitioner's reply to Produce Reporter Company which contained the informal subordination agreement made no mention of an intended debenture bond, but he did make it clear that "any trade obligations" would be paid "before liquidation" of the debt and that "any drawings" would be charged against his "annual profit sharing". The argument by petitioner that a proforma balance *278 sheet prepared by the accountant in 1956 to reflect the proposed incorporation referred to a "Note payable - long term" has little significance as the time for payment set out in the notice of indebtedness was not for at least 13 months and under good accounting principles should have been so categorized for balance sheet purposes. Accountants' Handbook (4th Ed.) sec. 20.2. A more controlling factor we think is that the debt obligation contained in both the balance sheet incorporated into the minutes of the board of directors' meeting and the balance sheet submitted to Produce Reporter Company was designared as a "NONCURRENT LIABILITY - Note payable to officer - unsecured and without interest". This description very adequately describes the notice of indebtedness as it contained all the requisites of a note, was specifically stated to be unsecured and did not bear interest. It would also be properly characterized as a "noncurrent liability" as it was not payable during the corporate year ending July 31, 1957. Conversely, the debenture bond was, as its name indicates, a bond extending over a relatively long period of time which provided for the payment of interest. Petitioner submits *279 that a further impediment in construing the notice of indebtedness as a note is the lack of authorization by the board of directors. The minutes of the board of directors' meeting on February 25, 1957, show: NOW, THEREFORE, BE IT RESOLVED: First, that this Board, in the exercise of its best skill and judgment, fixes and determines the value of the said property in current money of the United States in accordance with the Financial Statement of Cash Produce Company, Incorporated of January 1, 1957, * * * said Statement of the valuation of the assets and liabilities as set forth in said Statement, a copy of which is hereby attached and incorporated in the within resolutions and said balance sheet of said assets and liabilities of said Statement is hereby adopted as follows: * * *
NONCURRENT LIABILITY Note payable to officer - unsecured and without interest $48,893.46 * * *
If the notice of indebtedness and the "noncurrent liability" contained in the balance sheet incorporated into the minutes of the board of directors' meeting are one and the same, as we think they are, such incorporation is sufficient authorization. It should be noted while commenting on the topic *280 of authorization that there is a recitation in the debenture bond that it was "executed pursuant to the articles of incorporation of the said Corporation and in pursuance of a resolution of said Corporation passed on the 1st day of January, 1957". The petitioner produced neither the articles of incorporation nor the resolution which supposedly authorized the issuance of the debenture bond. From the afore-going enumerated factors it can be seen that not only the instrument, but also the peripheral facts and circumstances contravene the petitioner's contention that the notice of indebtedness was merely intended to be a memorandum. To base our decision solely upon the declared intention of the petitioner unsupported by the evidence would be to disregard completely the realities of the situation. As we view the evidence we do not find such an "interdependent" relationship so as to justify a conclusion that a "single scheme" of incorporation existed of which the issuance of the debenture was the final step. Our view of the evidence is that the transaction was cast as depicted by the Commissioner, with the petitioner receiving in return for the assets transferred, stock and a note which *281 entitled him to draw funds from the corporation at will. This plan, however, was inadvertently thwarted when petitioner discovered that such withdrawals would affect the credit rating of the corporation. And later, in January 1958, when it was discovered that the incorporation might not be entirely tax-free, an antedated debenture bond which related back to the time of the incorporation was prepared by the attorney to shore up the transfer and render the entire exchange tax-free and the accountant at that time entered a new account on the books of the corporation entitled "Long - Term Liability" with the explanation "Indenture due Rufus F. Turner from transfer of assets at date of incorporation" which was dated January 1, 1957 to conform to the issuance date of the debenture bond. The next approach taken by petitioner is that the notice of indebtedness does not constitute "other property" within the meaning of section 351(b). This contention is not predicated upon an agreement that the notice of indebtedness was a security under section 351(a), but rather that the notice of indebtedness was received by petitioner only as evidence of an existing obligation and not in payment of an *282 obligation. We agree with petitioner that the notice of indebtedness is written evidence of an existing enforceable obligation. However, we do not agree that this is not "other property" within the purview of section 351(b). Petitioner cites Jay A. Williams, 28 T.C. 1000 (1957) and extracts from context our statement that "A note received only as security, or as an evidence of indebtedness, and not as payment, may not be regarded as income". In Williams we dealt with the question of whether a note received in payment of services was income to the recipient. We held the note was not income as it was established to our satisfaction that the note was not received in payment of the outstanding debt due the taxpayer for the performance of services and that "a simple change in the form of indebtedness from an account payable to a note payable is insufficient to cause the realization of income by the creditor". It is obvious that petitioner by this contention has completely misconceived the import of the note in this case. The question presented here is not whether the receipt of the note resulted in ordinary income under section 61(a), Schlemmer v. United States, 94 F. 2d 77 *283 (C.A. 2, 1938); Robert J. Dial, 24 T.C. 117 (1955); Jay A. Williams, supra, but whether gain was recognizable on the incorporation as a result of the receipt of the note under section 351. Our afore-going conclusion was that the notice of indebtedness was an enforceable note and the cases have uniformly held that a note of such duration does not comply with the statutory concept of a security. Pinellas Ice & Cold Storage Co. v. Commissioner, 287 U.S. 462 (1933); Cortland Specialty Company v. Commissioner, 60 F. 2d 937 (C.A. 2, 1932), certiorari denied 288 U.S. 599 (1933); Lloyd-Smith v. Commissioner, 116 F. 2d 642 (C.A. 2, 1941); Neville Coke & Chemical Co., 3 T.C. 113 (1944), affd. 148 F. 2d 599 (C.A. 3, 1945), certiorari denied 326 U.S. 726 (1945); Camp Wolters Enterprises, Inc., 22 T.C. 737 (1954), affd. 230 F. 2d 555 (C.A. 5, 1956), certiorari denied 352 U.S. 826 (1956). Inasmuch as it does not qualify as a security under *284 section 351(a), it is "other property" under section 351(b). Rev. Rul. 56-303, 1956-2 C.B. 193. Petitioner continues, that even if the notice of indebtedness is "other property" it had no fair market value. He says that it is apparent from the financial condition of the corporation and the testimony of the parties concerned that there was no immediate intention or ability to pay the obligation. The evidence does not disclose an inability on the part of the corporation to pay the note. Although there was evidence regarding the value of the note it was focused primarily on the aspect of its value as collateral security for a loan. There is a question as to whether it could be discounted; however, it should be kept in mind that, as previously indicated, this note was not an ordinary note whose value would increase as the maturity date approached, but was sui generis, as its provision that "the [petitioner] may draw funds from the corporation at any time upon the pledge of [the] note as security, said drawings to be deducted from the amount of [the] liability prior to settlement" made it in effect a drawing account. As we see it, the fair market value of the note was *285 at all times its stated value as petitioner at any time could have withdrawn such amounts, the only barrier to such withdrawals being the voluntary, self-imposed subordination agreement which could have been rescinded at any time by petitioner. We do not think that the evidence introduced establishes that the amount determined by Commissioner to be the fair market value is arbitrary or unreasonable. Petitioner in another phase of his assault upon Commissioner's determination argues that if we should find that the note has a fair market value nevertheless petitioner realized no gain on the transfer for the reason that the value of the stock and "other property" received was not in excess of the net adjusted cost basis of the tangible assets transferred. Simply stated, petitioner contends that the $74,300 which was ascribed to goodwill at the time of the incorporation was incorrect and that no goodwill existed or was transferred, or, if any was transferred, its value was negligible. The Commissioner says that the sole proprietorship possessed transferable goodwill with a value of $74,300. This presents a paradox as petitioner now attempts to retreat from his original position by relying *286 on Willoughby J. Rothrock, 7 T.C. 848 (1946) and a ruling, Rev. Rul. 60-301, 1960-2 CB 15, in which the Commissioner challenged the transfer of goodwill. Conversely, the Commissioner here does not challenge, but acquiesces in the original amount designated by petitioner as goodwill. In addition to the aforementioned case and ruling, petitioner also calls attention to the testimony of a representative of Produce Reporter Company who stated that goodwill had no value in arriving at a rating for a produce business. A query from the Court revealed that this rating was from the standpoint of a creditor rather than a possible purchaser and that all assets were viewed in regard to their basis at liquidation in order to ascertain their worth to creditors in the event of such liquidation. This sheds little light upon the problem. We are convinced that the corporation acquired something more in value at the incorporation of the sole proprietorship than the tangible assets transferred, which was goodwill, and petitioner has not shown the Commissioner's determination of the amount of this goodwill to be erroneous. See John W. Harrison, 24 T.C. 46 (1955), *287 affd. 235 F. 2d 587 (C.A. 8, 1956), certiorari denied 352 U.S. 952. It follows that the Commissioner's determination must be sustained. It is unnecessary to discuss petitioner's final contention, that the notice of indebtedness represented an equity interest equivalent to stock, in view of our holding that the notice of indebtedness is a note. The second issue presented is whether petitioner improperly reported the receipt of a $10,000 bonus on his joint return for the year 1957. Petitioner claims: (1) that the bonus was not formally authorized by the corporation until January 7, 1958; (2) that the stock issued was not authorized by the State Corporation Commission to be issued until after January 7, 1958; and (3) that even if the stock was constructively received by petitioner on July 31, 1957, it had no substantial value at that time. As shown in the findings of fact, one of the closing entries of the corporation on July 31, 1957, credited "Capital stock" with $10,000, "To record additional salary paid to R. F. Turner in corporate common stock". A reference to this transaction was embraced in the minutes of the board of directors' meeting on January 7, 1958. It *288 stated that Having been previously approved by the board of directors the board voted unanimously to approve the payment of a bonus of $12,000.00 for the year ending July 31, 1957 to R. F. Turner, the president. Mr. R. F. Turner advised that after various withholdings that he had used the remainder of the sum of $10,000.00 in the purchase of 200 shares of the common stock at $50.00 per share to be issued and dated July 31, 1957. As we interpret the statement from the minutes of the board of directors' meeting, the bonus was a cash bonus of $12,000 which had "been previously approved by the board of directors". Petitioner then used "the sum of $10,000.00 in the purchase of 200 shares of the common stock [of the corporation] at $50.00 per share". Such an interpretation is in accord with a "Stock Statement" filed with the State Corporation Commission on January 10, 1958, which contained the recitation that "200 shares [of] common stock at $50.00 per share in one issue [were] to be issued for $10,000 in cash". It should be noted that at the bottom of the "Stock Statement" it states that "Rufus F. Turner, being first duly sworn, deposes and says * * *. The facts set forth in *289 the statement are true" followed by the signature of petitioner. The utilization of a part of the proceeds of the cash bonus to purchase corporate stock which was not authorized and issued until 1958 has no impact upon the proper reporting of the cash bonus for income tax purposes. We are convinced that petitioner's attempted repudiation of the transaction now, by claiming it was not a cash but rather a stock bonus is not supported by the facts and we disregard as irrelevant the arguments advanced by petitioner concerning the authorization, issuance and valuation of the corporate stock. The Commissioner must be sustained on this issue also. Decision will be entered for the respondent. Footnotes
1. SEC. 351. [1954 Code] (a) General Rule. - No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation. For purposes of this section, stock or securities issued for services shall not be considered as issued in return for property. (b) Receipt of Property. - If subsection (a) would apply to an exchange but for the fact that there is received, in addition to the stock or securities permitted to be received under subsection (a), other property or money, then - (1) gain (if any) to such recipient shall be recognized, but not in excess of - (A) the amount of money received, plus (B) the fair market value of such other property received; and (2) no loss to such recipient shall be recognized. (c) Special Rule. - In determining control, for purposes of this section, the fact that any corporate transferor distributes part or all of the stock which it receives in exchange to its shareholders shall not be taken into account.↩
2. Code of Virginia - § 8-509. Civil action on note or writing promising to pay money. A civil action may be maintained upon any note or writing by which there is a promise, undertaking, or obligation to pay money, if the same be signed by the party who is to be charged thereby, or his agent. * * *↩